UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JEAN SHAFER,

      Plaintiff,                            Civil Action No. 04-60257

v.                                   HON.  MARIANNE O. BATTANI
                                       U.S. District Judge
                                       HON. R.  STEVEN WHALEN
COMMISSIONER OF SOCIAL          U.S. Magistrate Judge
SECURITY,

      Defendant.
_____/

## REPORT AND RECOMMENDATION

Plaintiff Jean Shafer brings this action under 42 U.S.C. §405(g) challenging a final decision of Defendant Commissioner denying her application for  Disability Insurance Benefits (DIB) under Title II of the Social Security Act.  Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  For the reasons set forth below, I recommend that Defendant's Motion for Summary Judgment be DENIED, and that Plaintiff's Motion for Summary Judgment be GRANTED, remanding this case for further proceedings.

## PROCEDURAL HISTORY

On July 12, 2002, Plaintiff filed an application for Disability Insurance Benefits (DIB),  alleging an onset of a disability date of February 22, 2002  (Tr. 45-47).  After the initial denial of her claim, Plaintiff filed a timely request for an administrative hearing,

conducted on September 10, 2003 in Flint, Michigan before Administrative Law Judge (ALJ) Douglas N. Jones.  Plaintiff, represented by attorney Mikel Lupisella, testified (Tr. 408-433), as did Vocational Expert (VE) Mary Williams (Tr. 433-443).  ALJ Jones found Plaintiff not disabled at "Step four" of his analysis, concluding that Plaintiff retained the ability to perform her past relevant work (Tr. 25).  On October 22, 2004 the Appeals Council denied review (Tr. 5-7).  Plaintiff filed for judicial review of the final decision on November 22, 2004.

## BACKGROUND FACTS

Plaintiff,  born February 5, 1947  was age fifty-six when the ALJ issued his decision (Tr. 25, 45).  She received a high school diploma in 1965 and obtained nurse's aide certification in 1983 (Tr. 17).  Plaintiff's former work includes jobs as a welder, product handler and general inspector (Tr. 89).  Plaintiff alleges disability as of February 22, 2002 due to a lung impairment, head injury, vertigo, asthma, osteoarthritis of the knees, hypertension, bilateral carpal tunnel syndrome and a nerve impairment (Tr. 16).

### A.    Plaintiff's Testimony

On September 10, 2003, Plaintiff testified before ALJ that she lived in Flint, Michigan with her husband in a two story house (Tr. 409).  She stated that she received her high school diploma in 1965, attended an adult education class for one year, and received a nurse's aide certificate (Tr. 410).  She testified that she had not worked as a nurse's aide since 1984  (Tr. 411).

Plaintiff reported that she had last worked on February 22, 2002 (Tr. 411).  She stated

-2-

that the shop doctor gave her a work release due to occupational asthma (Tr. 411).  She stated that she received sick leave following her departure and currently received a total and permanent disability pension,  adding that she had a Workers' Compensation claim pending (Tr. 411).  She also stated that she was a litigant in a class action suit against General Motors alleging breathing problems as a result of chemicals used at her job location (Tr. 411-412).

        Plaintiff stated that she retained a driver's license and drove once or twice a week (Tr. 412).  She indicated that in addition to gall bladder problems that she had torn a tendon in her left leg in 1995 which obliged her to wear a molded plate inside her shoe, but had not undergone surgery to repair the tear (Tr. 415).  She reported that she had not smoked for the last twelve years (Tr. 416).  She stated that she exercised when possible,  adding that her foot and knee problems as well as "a pinched nerve" kept her from performing most types of exercise (Tr. 416).  She stated that she had been diagnosed with osteoarthritis in both knees and currently received Syndisk injections every six months (Tr. 418).  She reported that she also took medication for high blood pressure, asthma, as well as for  back, leg, and arm problems,  noting that all of her medication caused side effects, including fatigue, dizziness, and nausea (Tr. 418-420).  She stated that she had also undergone physical therapy for pinched nerves (Tr. 419).

        Plaintiff reported that before 1986, she worked as a press operator, then worked as a welder for  twelve years (Tr. 421).  She stated that she next became a general inspector, adding that she also performed the work of a product handler (Tr. 421).  She testified that her welding job obliged her to stand for most of her shift, while her inspecting job allowed her

to sit intermittently (Tr. 424).

Plaintiff opined that since ceasing work in 2002, some of her conditions had changed only minimally (Tr. 425).  She reported that she had not sought emergency room treatment and could bathe, dress, and groom herself without assistance (Tr. 425).  She denied belonging to clubs or social organizations, but testified that she tried to attend church at least once a week (Tr. 426).  She reported that she avoided grocery shopping, due to her knee condition and asthma (Tr. 426).  She indicated that her husband performed all the yard work and that she paid her daughter to clean her house (Tr. 426).

Plaintiff stated that she could sit for a maximum of forty-five minutes and stand for a maximum of fifteen (Tr. 427-428).   She reported that she could not walk for more than fifty to seventy-five feet and could lift a maximum of ten pounds (Tr. 428).  She stated that she was most comfortable seated in a reclining chair with her feet elevated (Tr. 428).   She added that she could not lie in a completely supine position due to breathing problems (Tr. 428).  She estimated that she spent three hours a day in her recliner with her feet elevated (Tr. 429).   She reported difficulty bending, squatting, pushing, pulling, gripping, reaching overhead, and fine dexterity manipulations (Tr. 429).  She testified that subsequent to a 1990 head injury she experienced vertigo when she moved her head too quickly (Tr. 430).

Plaintiff, right-handed, stated that she stood 5' 1" and weighed approximately 260 pounds (Tr. 431).  She stated that her neurologist had not recommended surgery or prescribed braces for her hand problems (Tr. 432).

B.     **Medical Evidence**[1]

In December, 1995 Warren Taranow, D.O., finding that Plaintiff experienced mild pes planus deformity and mild ankle degeneration, recommended that she might benefit from transfer to a desk job (Tr. 120-121).  In February, 1996 Dr. Taranow, noting that Plaintiff appeared to experience improvement when wearing a UCBL brace, again recommended a job transfer, stating that she would be "much better off with a job that did not require her to be on her feet all day" (Tr. 117). In July, 1996, Dr. Taranow stated that Plaintiff should continue stretching exercises and home therapy, adding that he did not believe that she was a surgical candidate at that time (Tr. 112).  In April, 1998, Dr. Taranow noted that Plaintiff had experienced "dramatic improvement" as a result of her new job which required her to stand for only short periods (Tr. 111).   In April, 1999, he reported that Plaintiff was "progressing well" (Tr. 110).  In June, 1999, Plaintiff complained of right foot problems (Tr. 107).  Dr. Taranow, finding Plaintiff's feet severely symptomatic, recommended that she take a two month leave of absence from work (Tr. 108).  In July, 1999, he prescribed a heel lift to equalize her leg lengths (Tr. 105).  In September, 1999 Plaintiff reported to Dr. Taranow that therapy had helped relieve knee problems (Tr. 103).  In May, 2000, he reported that Plaintiff began receiving a series of Synisc injections for knee pain, noting that treatment was complicated by her "moderate obesity" (Tr. 102).

In January, 2001 E. J. Daros, M.D. noted that Plaintiff experienced slightly elevated

---

[1]A substantial number of Plaintiff's medical reports  pertain to conditions unrelated her disability claim and are therefore omitted from discussion in this report.

blood pressure (Tr. 161). Plaintiff complained of "a little bit" of vertigo at an exam later that month along with sinius drainage (Tr. 161). Dr. Daros prescribed Zithromax and Simplex D (Tr. 161). In December, 2001, Plaintiff complained of shortness of breath (Tr. 232). Clark Headrick, D.O. found that Plaintiff's lung volumes were normal, concluding that her symptoms were consistent with "extraparenchymal restrictive lung disease highly consistent with a . . . weight of 260 plus pounds" (Tr. 232). In February, 2002, Dr. Daros diagnosed Plaintiff with obstructive sleep apnea, recommending that she use a CPAP devise, avoid sedatives, drugs, and alcohol, and weight loss (Tr. 183). In March, 2002, Dr. Headdrick found that Plaintiff experienced obstructive sleep apnea and persistent cough secondary to sinobronchial syndrome (Tr. 216). In May, 2002, an MRI of Plaintiff's lumbar spine showed "[m]oderate to severe hypertrophic changes" at L4-5 and L5-S1 bilaterally, but no evidence of recess or spinal stenosis or a herniated disk (Tr. 123). The same month, Jeffrey R. Levin, M.D., found that Plaintiff experienced moderate to severe degenerative changes in facet joints at L4-5 and L5-S1, but no evidence of lateral recess stenosis, spinal stenosis or herniated disk at any level (Tr. 244). An EMG performed in June, 2002 showed L5 bilateral radiculopahy, left tarsal tunnel syndrome, and right cubital tunnel syndrome (Tr. 241). In July, 2002, Dr. Daros administered Synvisc injections in both knees (Tr. 155). Plaintiff reported "almost immediate relief" (Tr. 155). The next month, Plaintiff received a Proventil inhaler for continued bronchial irritation (Tr. 153).

In August, 2002, Plaintiff began a series of physical therapy treatments (Tr. 236). In November, 2002 Plaintiff's therapist reported a forty percent improvement, but noted that

Plaintiff complained of increased lower back and leg pain (Tr. 237). Plaintiff reported "fair" compliance with a home exercise program (Tr. 237).

In November, 2002, Dr. Levin recommended that she accept an offer from her employer for total and permanent disability benefits (Tr. 238). In May, 2003, Dr. Levin, commenting that her condition was unchanged, noted that she had apparently received total and permanent disability as a result of chronic COPD (Tr. 266). In December, 2002 Dr. Headdrick reported that Plaintiff's cough and sinus drainage had worsened, diagnosing her with asthma, along with sinobronchial syndrome and obstructive sleep apnea (Tr. 207). In January, 2003, Plaintiff reported sinus problems (Tr. 362). However, Dr. Headdrick reported that Plaintiff's lungs were clear and her blood pressure was 100/70 (Tr. 362). Dr. Headdrick recommended that Plaintiff use Astelin "at two puffs twice a day on a regular basis," continue albuterol on an as needed basis and "avoid situations where she is exposed to allergens that [make] her uncomfortable" (Tr. 363). In July, 2002, Dr. Daros administered Synvisc injections in both knees (Tr. 155). Plaintiff reported "almost immediate relief" (Tr. 155). The next month, Plaintiff received a Proventil inhaler for continued bronchial irritation (Tr. 153).

A Physical Residual Functional Capacity Assessment conducted in September, 2002 found that Plaintiff retained the ability to lift twenty pounds occasionally and ten pounds frequently (Tr. 199). The report found further that Plaintiff could stand and/or walk for approximately six hours in an eight hour workday and sit for about six hours, with limited abilities to push and pull, due to Carpal Tunnel Syndrome (CTS) (Tr. 199). The report stated

that Plaintiff was limited to only occasional climbing, stooping, kneeling, crouching, and crawling, and limited her to frequent handling and fingering (Tr. 200-201). Her environmental limitations consisted of avoidance of even moderate exposure to vibration or fumes, odors, dusts, gases, or poor ventilation (Tr. 202). The assessment concluded by stating that Plaintiff retained the ability to walk three to four hundred feet (Tr. 203).

In January, 2003, Plaintiff reported sinus problems (Tr. 362). However, Dr. Headdrick reported that Plaintiff's lungs were clear and her blood pressure was 100/70 (Tr. 362). Dr. Headdrick recommended that Plaintiff use Astelin "at two puffs twice a day on a regular basis," continue albuterol on an as needed basis and "avoid situations where she is exposed to allergens that [make] her uncomfortable" (Tr. 363). In March, 2003 Kenneth Roseman, M.D. noted that the results of pulmonary function testing led him to believe that she should not continue at her most recent job (Tr. 307). He commented that Plaintiff's breathing capacity had improved since ceasing work (Tr. 306).

In April, 2003 Ralph S. Lazzara, M.D. examined Plaintiff on behalf of Disability Determination Service (Tr. 251-264). Dr. Lazzara noted that Plaintiff did not use an assistive device and had not received hospitalization in the past year or undergone surgery (Tr. 251). Plaintiff demonstrated a normal range of motion in the cervical spine, shoulder, elbow, hip, knee, ankle and wrist (Tr. 253-256). Dr. Lazzara opined that her MRI findings "do not appear to support her clinical symptoms" (Tr. 258). He concluded that Plaintiff could lift twenty pounds occasionally and ten pounds frequently; stand or walk at least two hours in an eight-hour workday, retaining limited abilities to push or pull in the upper and

-8-

lower extremities (Tr. 261-262).  He found that Plaintiff could balance, kneel, crouch, and stoop occasionally, but was precluded from climbing or crawling and required a sit/stand alternative (Tr. 262).  He found further that Plaintiff retained an unlimited ability to reach, handle, finger, and feel, as well as unlimited visual and communicative functions (Tr. 263).  Plaintiff's environmental limitations included dust, vibration, humidity/wetness, hazards, and fumes (Tr. 264).

Also in April, 2003, Mark E. Dyball, D.O. reported that Plaintiff experienced osteoarthritis in both knees (Tr. 274). Dr. Dyball reported that before recommending arthroscopy, he would insist that Plaintiff lose seventy-five pounds (Tr. 274).  Plaintiff stated that she did not want to undergo surgery (Tr. 274).  In June, 2003, Dr. Dyball administered the first of several Synvisc injections (Tr. 271).   Subsequent treatment notes indicate that Plaintiff reported an improvement from the treatments (Tr. 269).

### C.    Vocational Expert Testimony

VE Mary Williams, stating that her testimony comported with information contained in the Dictionary of Occupational Titles (DOT), indicated that her findings represented the geographical scope of the lower peninsula of Michigan (Tr. 433-434).  ALJ Jones posed the following question to the VE:

>  "If I were to ask you to assume a hypothetical individual of the [Plaintiff's] age, education and past work experience, who was limited to performing light work that involved the option to alternate between sitting and standing at will

and involved only occasional bending at the waist, or occasional bending at the knees, no crawling, no climbing stairs, no climbing ladders, no, only occasional exposure to unprotected heights or uncovered intrinsically hazardous machinery so that just being close to the machine could be dangerous if one had poor balance.  No exposure to dust, fumes or other airborne pollutants other than what might be routinely expected in an indoor air environment and no exposure to, you know, consistent with OSHA clean air regulations and no exposure to high humidity or very cold or very hot temperature, and no use of vibrating hand tools.  Would such a person be able to perform any of [Plaintiff's] past jobs, either as she actually performed them or as they generally occur in the national economy? And I'll ask you not to consider the press operator job because it appears that that was done more than 15 years before the application was filed "

(Tr. 434).

The VE replied that based on the hypothetical limitations, Plaintiff could not work at her past inspector job as she previously perform it, but retained the ability to perform a restricted number (6,000) of inspector positions (Tr. 434-435).  She indicated that such jobs, which included a sit/stand option would be classified as unskilled, at the light exertional level (Tr. 435).   She stated further although additional inspector positions at the sedentary exertional level existed, such positions did not comport with the description of Plaintiff's past work (Tr. 436).

In response to questions from Plaintiff's attorney, the VE reported that if Plaintiff were further limited to only occasional use of the hands for griping, grasping, handling, fingering, and feeling, that she could still perform the inspector position, but could not hold such a position if limited to less than occasional use of her hands for the above activities (Tr. 437).

### D.   The ALJ's Decision

-10-

Citing Plaintiff's medical records, ALJ Jones found that Plaintiff's impairments of status-post left posterior tibial tendon tear ; degenerative disc disease and osteoarthritis of the lumbar spine and the right sacroiliac joint; degenerative joint disease of both knees; moderate restrictive lung disease; asthma; hypertension; sleep apnea; exogenous obesity; vertigo; bilateral carpal tunnel syndrome; bilateral cubital tunnel syndrome; and left tarsal tunnel syndrome were collectively severe within the meaning of the Regulations, but were not "sufficiently severe to meet or medically equal the criteria of any impairment, or combination of impairments, contained in the Medical Listings" (Tr. 24).

He found that Plaintiff retained the RFC to perform:

"a range of light exertional work . . . that permits occasional lifting and carrying of up to twenty pounds and occasional lifting of up to ten pounds. [Plaintiff] requires the option to alternate between a sitting and standing position at will. She can never crawl or climb stairs or ladders. She can occasionally bend at the waist [stoop] and occasionally bend at the knees [crouch]. [Plaintiff] can not operate any vibrating hand tools. She can not tolerate exposure to constant wetness, high humidity or exposure to dust, fumes or other air borne pollutants."

(Tr. 25).

The ALJ determined that Plaintiff retained the ability of returning to her past relevant work as a general inspector (Tr. 25). In support of his finding that Plaintiff's allegations of physical limitations were "not totally credible," he noted that Plaintiff continued to engage in "an extensive range of daily activites," including visiting her parents, caring for her grandchild, and dining out (Tr. 22, 24). He further noted that Plaintiff's allegedly disabling conditions had not required "hospitalization, surgical intervention or other aggressive

-11-

treatment" (Tr. 22).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services,* 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services,* 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected

-12-

to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy.  20 C.F.R. §416.920(a).  The Plaintiff has the burden of proof as steps one through four, but the burden shifts to the Commissioner at step five  to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

### A.    RFC

Plaintiff argues that the ALJ's RFC, which stated that she could perform work at the light exertional level, failed to account for all of her limitations *Plaintiff's Brief* at 8-11.  She also maintains that the ALJ's finding that she could lift ten pounds occasionally stands at odds with 20 CFR 404.1567(b) which defines light work in part as the ability to lift ten pounds frequently. *Id.* at 11.

An RFC describes an individual's residual abilities. *Howard v. Commissioner of Social Security,* 276 F.3d 235, at 239 (6th Cir. 2002).  "RFC is to be an 'assessment of

[Plaintiff's] remaining capacity for work' once her limitations have been taken into account." *Id.* (*quoting* 20 C.F.R. § 416.945). It is measured by a common sense approach viewing Plaintiff's conditions as a whole. *Paris v. Schweiker,* 674 F.2d 707, 710 (8th Cir. 1982). In determining a person's RFC, it is necessary to consider (1) objective medical evidence as well as (2) subjective evidence of pain or disability. 20 C.F.R. § 404.1545(a)(RFC must be based on all relevant evidence).

Contrary to Plaintiff's argument, the limitations found in the RFC, standing on their own, are supported by substantial evidence.[2] First, although Plaintiff maintains that the RFC failed to take into consideration her upper extremity limitations caused by CTS, the ALJ's RFC, which limits Plaintiff to "occasional lifting of up to ten pounds," and precludes the use of vibrating tools, comports with the September, 2002 Physical Residual Function Capacity Assessment which found that Plaintiff retained a limited ability to push and pull, along with the ability to finger and handle objects frequently - despite her diagnosis of CTS (Tr.199, 201). Moreover, the RFC composed by the ALJ falls even more easily within the ambit of Dr. Lazzara's April, 2003 findings that Plaintiff retained an unlimited ability to reach, handle, finger, and feel (Tr. 263).

Despite Plaintiff's claim that she experienced great difficulty opening doors, buttoning clothes, manipulating zippers, and picking up coins, along with an inability to lift more than

---

[2]However,  as discussed in section B., *infra*, the RFC, as found in the decision, stands at odds with the ALJ's ultimate conclusions.

ten pounds, the ALJ's credibility assessment properly rejected a portion of these claims (Tr. 22, 428,429).  Dr. Lazzara, finding that Plaintiff experienced a normal range of elbow and wrist motion, noted that "[h]er MRI findings do not appear to support her clinical symptoms," and further, that she was not engaged in active treatment for her condition (Tr. 258).  While Plaintiff's medical records indicate a diagnosis of CTS, (acknowledged at Step two by the ALJ) the same records do not support the degree of impairment that she alleges. It is Plaintiff who bears the burden of proof in substantiating the extent of her claimed limitations. *See Duncan v. Secretary,* 801 F.2d 847, 853 (6th Cir.1986); *McCormick v. Secretary,* 861 F.2d 998, 1002-1003 (6th Cir.1988).  *See also,Hurst v. Secretary,* 753 F.2d 517, 519 (6th Cir.1985) (limitations must be substantiated by some objective, clinical or laboratory findings.)   In addition, Plaintiff's  own admissions support the ALJ's RFC. She reported to Dr. Lazzara that she continued to drive, do dishes, and cook (Tr. 251).  She acknowledged at the hearing and in her daily activities form that she continued to bathe, groom, and dress herself on a daily basis (Tr. 84, 85, 425).   The RFC found in the administrative decision stands supported by record evidence.

### B.  Past Relevant Work

Plaintiff also faults the ALJ for his Step Four finding that Plaintiff could return to her former job of general inspector, arguing that although she performed her past work as an general inspector at the light exertional level,  the decision erroneously concludes that the same job can be performed at sedentary rather than light level.  *Plaintiff's* Brief at 7.  Citing *Hargender v. Califano,* 575 F. 2d 434 (3rd Cir. 1978), she also maintains that the ALJ did not

-15-

make "full and explicit findings" sufficient for the Court to evaluate his decision. *Plaintiff's Brief* at 7.  She claims further, citing *Young v. Apfel*, 39 F. Supp. 2d 1327 (N.D. Okla. 1999), that the ALJ improperly delegated his analysis to the VE at Step Four.  *Id.*

At Step Four, the Commissioner considers whether the claimant has the RFC to perform the functional demands and duties of a past job as actually performed by the claimant. SSR 82-61.  If so, the claimant is not disabled.  If not, the Commission considers whether the claimant can perform the functional demands and job duties of the occupation as generally required by employers throughout the national economy. *Id.*  Thus, if a claimant has the RFC to work at his or her past job as actually performed, even if that particular job is less demanding than the work as generally performed, or even if it involves fewer hours or greater opportunity for rest, he or she will be found not disabled at step four.  *Stephens v. Shalala,* 50 F.3d 538, 542 (8th Cir. 1995).[3]

Under SSR 82-62, a three-prong test must be met in order to find that a claimant can return to his past relevant work "(1) a finding of fact as to the individual's RFC; (2) a finding

_____

[3]SSR 82-61 cites another possible test, "[w]hether the claimant retains the capacity to perform a past relevant job based on a broad generic, occupational classification of that job" *Brooks v. Sullivan,* 766 F.Supp. 584, 591 (N.D.Ill.,1991); SSR 82-61.  However, SSR 82-61 goes on to caution against the dangers of using such a generalized test. "Finding that a claimant has the capacity to do past relevant work on the basis of a generic occupational classification of the work is likely to be fallacious and unsupportable." *Pinto v. Massanari,* 249 F.3d 840, 846 (9th Cir. 2001).  The court in *Steward v. Bowen,* 858 F.2d 1295, 1300 (7th Cir.1988) also rejected the application of a "broad generic, occupational classification" in making a Step four determination: "SSR 82-61 clearly refers to *particular* past occupations, not general classifications."

of fact as to the physical and mental demands of the past job; and (3) a finding of fact that the individual's RFC permits a return to that past job."

Contrary to Plaintiff's argument, in and of itself, a change in exertional level from light to sedentary at Step four does not constitute error. *See Sloan v. Sec. of HHS* 1993 WL 503129, 3  (N.D.Ohio,1993) ("[T]he fact that claimant cannot return to her past relevant work as she had performed it, does not preclude the ALJ from finding that Sloan can return to past relevant work at the lesser exertional level of sedentary work as the job is normally performed in the national economy.")

Plaintiff's argument that the ALJ impermissibly delegated his fact-finding responsibility to the VE is also unpersuasive.  First, the ALJ may support a step four finding with a VE's testimony. *See Walker v. Secretary of Health and Human Services,* 884 F. 2d 241, 245 (6th Cir. 1989).  The ALJ's reliance on the VE's testimony for evidentiary support is not the same as delegating the decision.  Moreover, Plaintiff's related argument that suggests that the ALJ was prohibited from using the VE's testimony in making a Step Four determination is also without merit.  Although the Plaintiff correctly notes that the ALJ is not required to consult a VE in making a Step Four determination *(See Dodds v. Commissioner of Social Security,* WL 2002 1880754, 3 (E.D. Mich. 2002)), it does not follow that he is *forbidden* to use a VE. *See Studaway v. Secretary of Health and Human Services,* 815 F.2d 1074, 1076 (6th Cir.1987) (affirming the ALJ's decision to use a VE's testimony in making a Step Four determination).  Further, "[a]t [S]tep four of the sequential evaluation process, the decision to use a vocational expert is at the discretion of the ALJ. The

-17-

Commissioner has noted that such experts are used to resolve complex vocational issues."
*Mays v. Barnhart,* 78 Fed. Appx. 808, 813-814  (3rd Cir. 2003)(internal citations omitted).

The administrative decision,  however, does contain  reversible  error.  While for the most part, the ALJ adequately  supported his findings, his explicit conclusion that  that Plaintiff could perform her past work as a general inspector at the sedentary level of exertion is clearly erroneous and does not meet the  requirements of SSR 82-61[4] (Tr. 23, 24).  At the hearing the VE clearly stated that if the inspector position were modified to the point where it became a sedentary position, the job could not be deemed past work (Tr. 436).

VE: "[h]er past work would not fall into your question about sedentary"

ALJ: "Either as actually done or as customarily done."

VE: "I have sedentary position like a sedentary inspector."

ALJ: "But it won't fit past work."

VE: "That's right."

(Tr. 436).  The VE later confirmed that if Plaintiff were limited to lifting ten pounds or less occasionally (as stated in the RFC), combined with sitting most of the time, it would place her RFC in the sedentary category (Tr. 441).  More importantly,  when the ALJ incorrectly stated that "[t]he claimant also has past relevant work experience as a general inspector,

---

[4]  Plaintiff makes a related argument that her advanced age combined with the ALJ's finding that she could perform sedentary work necessitated a disability finding under the grids.  This is incorrect.  *See Preslar v. Secretary of Health and Human Services,*  14 F.3d 1107, 1110-1111 (6th Cir.1994); 20 C.F.R. § 404.1563(d). (A finding that an individual of advanced age is limited to sedentary work mandates a disability only in a *Step five* determination)(emphasis added).

-18-

which required only sedentary exertion," his statement was not only contrary to the VE's testimony and the DOT's definition of general inspector, but he also appeared to acknowledge that the RFC stated in his opinion reflected a sedentary level of exertion[5] (Tr. 23).

While this Court might assume, given the ALJ's line of questioning at the hearing and administrative findings as a whole, that the he really intended to state that Plaintiff could lift ten pounds or less *frequently* and that Plaintiff could perform her past job as a general inspector at the *light* exertional level, such a inference would be unduly speculative. The ALJ "must articulate, at some minimum level, his analysis of the evidence to allow the appellate court to trace the path of his reasoning." *Lowery v. Commissioner, Social Sec. Administration,* 55 Fed.Appx. 333, 339, WL 236419, 5 (6th Cir. 2003) (*quoting Diaz v. Chater,* 55 F.3d 300, 306 (7th Cir.1995)). The inconsistencies between the stated RFC, the VE's testimony, and the exertion requirements of Plaintiff's past work darken the path of the ALJ's reasoning. The Court needs illumination.

Given the inconsistencies and ambiguities in the ALJ's decision, a remand is required. The final question is whether to remand for further administrative proceedings and findings or to remand for an award of benefits using Plaintiff's disability onset date for calculating past due benefits. In *Faucher v. Secretary of Health and Human Services*, 17 F.3d 171, 176 (6th Cir. 1994), and *Newkirk v. Shalala*, 25 F.3d 316, 318 (6th Cir. 1994), the

---

[5]*The Dictionary of Occupation Titles* (DOT) states that a general inspector (Code no. 609.684-010) is performed at the light level of exertion.

-19-

courts held that it is appropriate to remand for an award of benefits when "all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Id.* This entitlement is established if "the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Faucher,* 17 F.3d at 176 (citing *Mowery v. Heckler*, 771 F.2d rectification, 973 (6th Cir. 1985)). The errors in the administrative decision, while critical, do not suggest that Plaintiff is automatically entitled to benefits. The ALJ's opinion contains both a solid analysis of Plaintiff medical sources and a well supported credibility determination. Further, Plaintiff does not present an overwhelming case for benefits. Thus, I find that pursuant to *Faucher,* this case should be remanded for a clarification of the ALJ's decision.

## CONCLUSION

For the reasons stated above, I recommend that Defendant's Motion for Summary Judgment be DENIED and that Plaintiff's Motion for Summary Judgment be GRANTED, and that this case be remanded for further proceedings.

Any objections to this Report and Recommendation must be filed within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with

specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.


                                        s/R. Steven Whalen
                                        R. STEVEN WHALEN
                                        UNITED STATES MAGISTRATE JUDGE

Dated: October 7, 2005

### CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on October 7, 2005.


                                        s/Gina Wilson
                                        Judicial Assistant